In the Matter of SOL. L. YOUNGENTOB, an Attorney,
Respondent.

First Department, February 1, 1918.

**Attorney at law — suspension from practice — unlawful refusal to
return letters to client — misappropriation of money due to
counsel.**

Attorney at law suspended from practice for refusing to return to a client
letters upon which he had no lien or claim, and for failure to pay counsel
engaged by him, and for the appropriation to his own use of the money
due such counsel.

DISCIPLINARY proceedings instituted by the Association of
the Bar of the City of New York.

*Jabish Holmes* of counsel [*Thomas M. Healy* with him on
the brief; *Einar Chrystie,* attorney], for the petitioner.

*Robert H. Elder,* for the respondent.

CLARKE, P. J.:

Respondent was admitted to practice as an attorney and counselor at law in March, 1900, at a term of the Appellate Division, Second Department, and has since practiced in the First Judicial District. The petition contained two specifications of unprofessional conduct charged against the respondent. (a) That in March, 1916, one Martha E. Grant consulted the respondent concerning domestic difficulties she was having with her husband, who, at the time, was living in Iowa. As Mrs. Grant had no grounds for a divorce and although respondent knew this he nevertheless advised that she should sue for a divorce representing that he could obtain one for her and fifteen dollars a week alimony; that relying upon the respondent's advice and representations Mrs. Grant paid him the sum of sixty dollars, it being understood that his fee for obtaining the divorce was to be one hundred and fifty dollars and that the balance thereof was to be paid from the allowance which her husband might be induced to give her; that about a month after paying the respondent the sixty dollars, Mrs. Grant decided that she would not institute any proceedings against her husband and so advised the respondent, who, up to that time, had done nothing in the matter, except to write two letters to Mr. Grant making demands upon him for the support of his wife and child and threatening legal proceedings unless he did support them. At this time she asked the respondent to return to her the sixty dollars less a reasonable fee for what he had already done in the matter, and also for the return of certain letters from her husband which she had intrusted to the respondent, but the respondent refused to return any part of the money to her and although he had no lien upon the letters in question, he refused to return them to her, unless she would execute in his favor a general release. This Mrs. Grant refused to do; whereupon the respondent demanded more money from her and threatened to sue her unless she paid it. To date the respondent has not returned the letters or any part of the money paid to him as aforesaid.

The learned official referee has reported that he found no misconduct in making the agreement and retainer and receiving the sixty dollars; that it was the privilege of Mrs. Grant

to discontinue the employment; that it was clear at that time that she was not indebted to him and that he had no lien on the letters she had deposited with him.   He proceeds as follows: " The respondent did not at the time he refused to give up the letters claim any lien.   Before the grievance committee of the petitioner he said: ' Q. You don't mean that you wanted a receipt for the letters.   You mean that you wanted her to give a release?   A. Well, a receipt covering everything.   Q. Releasing you from all claims?   A. From all claims.   Q. That is a release.   Don't call it a receipt. She offered to give you a receipt for the letters.   A. She offered —   Q. That you refused.   A. That I refused to do. Q. You insisted on holding the letters unless she gave you a release?   A. Yes.   Q. And you claim that that is all right? A. I claim — I said to her, rather than cut the thing in two — if there was going to be any dispute, I wanted to settle the thing at this time.   Q. The letters belonged to her? A. Correct, and I was willing to return —   Q. And she paid you all that you were entitled to?   A. Correct.   Q. You had no lien upon the letters.   They were her property, and she was demanding it from you?   A. She was demanding money from me also.   Q. Suppose she did.   Did not the letters belong to her?   A. The letters belonged to her.   Q. Did you have any lien on them?   There was nothing due you.   You could not have a lien on them; there was nothing due you? A. No, except this; I will tell you frankly I did not take the trouble of ascertaining whether or not she had reconciled. Q. What difference does that make?   A. None at all, except that I did not want any further trouble.   I said ' If we're going to have a dispute about this thing '—   Q. Didn't you realize it would have been less trouble if you had given the letters to her?   A. If she hadn't abused me, and if she hadn't walked into the office as she did without waiting until I was disengaged, she would have gotten those letters from me.' "

In this proceeding he testified as follows: " Q. Did you tell her that you claimed a lien on the papers, or you were entitled to hold them?   A. I told her that I could, claiming that she still owed me ninety dollars; and I told her that I could claim to keep those papers; and I stood ready and willing to return them and even release her of the obligation

that she still owed me on the balance of the payment in order to straighten the matter out and have no further dispute about it.   Q. Now, did you claim before the Bar Association that you had a lien on these papers?   A. Why yes, I explained — I explained at the time to the Bar Association, and they differed with me. * * * Q. Now, when she came and asked you to give back a certain portion of the fee, and demanded her letters, you refused to do it unless she gave you a release, didn't you?   A. Not exactly a release.   I drew up a paper, and the substance of that paper was that I wanted her to sign a paper that she received from me those letters, and I wanted — because she —    Q. [Interposing] What was she to release,— to release you from what?   A. From further obligations with reference to my services in her behalf, and that she relieved me — she relieved me.   * * * Q. Now, at the time you asked her to sign that paper she did not owe you any money, did she?   A. Why yes.   Yes, I regarded she still owed me ninety dollars, according to my arrangements with her."

It is quite clear from all the testimony in the matter that at the time Mrs. Grant demanded the return of the letters the respondent was utterly unjustified in refusing that demand. There could be no lien for she had admittedly paid him in full all that he demanded up to that time.   He did not couple the refusal to deliver with any demand for any further sum at that time and his subsequent claim upon the hearing before the referee in direct contradiction of his claim when examined before the grievance committee is obviously an afterthought for the purpose of justification by way of a claimed lien and we agree with the conclusions of the learned official referee that the retention of the letters in the circumstances was violative of the standards prevailing in the legal profession and of the rule of conduct which the Supreme Court requires of the members of the bar.

(b) The substance of the allegations contained in this specification is that in March, 1914, the respondent was the attorney of record for the plaintiff in two cases against the Nassau Electric Railway Company and that he engaged Frederick Fishel, a member of the New York bar, to act as counsel in said cases; that one of the cases came on for trial, Mr. Fishel selected the jury and opened the case, when both

First Department, February, 1918.          [Vol. 181.

cases were settled for $2,000, and that on May 12, 1914, this amount was paid to the respondent, and thereafter the actions were discontinued and the respondent received $1,000 for his fee; that Mr. Fishel made several demands on the respondent for his share of the fee, but the respondent failed to comply therewith and appropriated the money due Mr. Fishel to his own use.

The main contention of the respondent, by way of explanation and defense, is that the agreement with Mr. Fishel was that the latter was to receive twenty per cent as his share of the fees, whereas he has always claimed twenty-five per cent. It appearing that after the settlement of the cases the respondent passed Mr. Fishel in the corridor of the court house and said to him: " As soon as I get the money, why, I will see you." Two or three weeks passed and Mr. Fishel not having heard from the respondent concerning his compensation, endeavored to get in touch with the respondent but was unsuccessful, and he thereupon examined the judgment record and learned that the judgment had been satisfied. Under date of May 27, 1914, respondent wrote Mr. Fishel as follows:

" I have been unable up to the present time to adjust your end of the Kaiserauer matter due to actual engagements in matters of importance.

" It is necessary, which will take a little time, to go over the disbursements incurred so that I could give myself credit when making allowances, which I will try to do between now and the early part of next week."

Not having received his compensation, Mr. Fishel sued the respondent and recovered a judgment by default for the sum of $214. Thereafter the respondent made a motion to open the default and the motion was granted under terms, which the respondent did not comply with. The respondent was examined in supplementary proceedings in an effort to recover upon that judgment. At that time he testified that he had no property of any kind except a balance of $1.60 in one bank and a balance of less than $5 in another bank, and that no one held any property in trust for him. Respondent claims that he has always been ready, able and willing to pay Fishel twenty per cent of the net fees received by him, to wit, $110. Before the grievance committee he testified that he had given money over to his sister so that $110 was held by her in

trust for Mr. Fishel. Before the referee in this proceeding he testified that he apparently misunderstood the questions of the members of the committee and did not intend to so testify; that although he did not have the money personally with which to pay Mr. Fishel the $110 he admits was due, he had made arrangements with his sister, who had money in the bank, to let him have that amount at any time Mr. Fishel would accept it. It is impossible to reconcile his testimony before the grievance committee with that upon the reference. His sister, Mrs. Wolper, who at the time was in the employment of the respondent as a stenographer and typewriter at a salary of $12 a week testified as follows: " He was telling me about this money that he wanted to give to Mr. Fishel and he asked me if he could arrange with me at any time to pay the amount that he — that Mr. Fishel was entitled to — $110. I said, ' Yes, any time Mr. Fishel wants the $110 I can give it to you.' "

The learned official referee concludes as follows: " I do not consider these transactions as of much significance, for the reason that in my opinion, if we assume the respondent did exactly what he claims he did and Mrs. Wolper was able to make good, it does not constitute an adequate explanation of his conduct in the premises toward Mr. Fishel. It was the duty of the respondent within a few days, at the most, to inform Mr. Fishel of his receipt of the money and to tender at least the $110 he conceded to be due. On the contrary he left Mr. Fishel to learn of the settlement from the records of the court, and even after his letter to Mr. Fishel he did not act promptly and squarely in endeavoring to effect a settlement but appropriated the entire fund to his personal use."

The respondent's own testimony produced a most unfavorable effect upon this court. It was shifty, evasive and lacking in candor. His conduct in both matters complained of as portrayed by himself shows that he is deficient in the characteristics of straightforwardness, honor and sense of personal responsibility expected from a member in good standing of an honorable and dignified profession. There may have been a real dispute between him and his brother lawyer, whom he had engaged as counsel, as to the terms of the retainer, and his personal use, which he admits, of the entire

amount received as a fee was undoubtedly caused by his necessities, but the judgment fixed the amount due to his associate. His claim of always having on hand, in some way or other, enough to pay the amount, which he himself admitted was due, is too flimsy to receive acceptance by this court.

We are of the opinion that the respondent has been guilty of professional misconduct and that he should be suspended from practice for six months, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions to be incorporated in the order to be entered hereon.

SCOTT, SMITH, PAGE and SHEARN, JJ., concurred.

Respondent suspended for six months, with leave to apply for reinstatement at the expiration thereof as stated in opinion. Order to be settled on notice. ·