Elizabeth K. KNAPP, Plaintiff,

v.

Walter P. McFARLAND, Defendant.

Walter P. McFARLAND, Plaintiff,

v.

Lester J. TANNER and Arthur S. Friedman, Defendants.

No. 69 Civ. 2590.

United States District Court,
S. D. New York.

July 1, 1971.

Supplemented Opinion July 9, 1971.

After Remand June 21, 1972.

**602**

Tanner & Friedman, New York City, for Elizabeth K. Knapp and pro se; Arthur S. Friedman, New York City, Lester J. Tanner and Hyman Frankel, of counsel.

Eaton, Van Winkle & Greenspoon, New York City, for Walter P. McFarland; Samuel N. Greenspoon, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

As indicated by the amended title above set forth, two actions are involved in this matter, to wit, (1) an action by Elizabeth K. Knapp, as assignee of Tanner and Friedman, for the collection of legal fees, as more particularly hereinafter set forth; (2) an action by Mc-

Farland against Tanner and Friedman for repayment of monies heretofore paid on account of legal services upon the ground of certain alleged breaches of fiduciary obligations by said attorneys. Since this action contemplated the return of monies from Tanner and Friedman, the assignors, it became necessary to permit the institution of the second action and its joinder with the original action for trial.

## I.

### KNAPP v. McFARLAND

Plaintiff, Elizabeth K. Knapp (hereinafter "Knapp") has instituted an action as the assignee of Lester J. Tanner and Arthur S. Friedman (hereinafter jointly referred to as "Tanner and Friedman"), attorneys at law, to recover moneys allegedly due them for legal services rendered on behalf of, and disbursements incurred for, the benefit of defendant Walter P. McFarland (hereinafter "McFarland") in connection with and following from the enforcement of various claims and rights under certain existing judgments and decrees of this court in an action therein entitled, "WALTER P. McFARLAND, EDWARD P. JOHNSON and JOHN LOUGHRAN, plaintiffs, against GEORGE S. GREGORY, ALEXANDER WESTREICH, N. V. HANDELMAATSCHAPPIN ANTILIA, SOL DRESCHER and LOUIS ROSENBERG, defendants," Civil No. 124–259 (hereinafter referred to as the "Gregory action" or "the suit").

Knapp's complaint sets forth four alleged causes of action which are briefly described as follows:

#### 1. First Cause of Action

The first cause of action alleges an express contract under which McFarland and Edward P. Johnson (hereinafter "Johnson") jointly and severally agreed to pay to Tanner and Friedman the sum of $155,000 (in addition to time charges) if McFarland and Johnson acquired the leaseholds to Arlington Towers (hereinafter "the Towers"), the subject matter of the Gregory action above

referred to. Knapp contends that such a "bonus" was payable to Tanner and Friedman regardless of the purchase price required by McFarland and Johnson to obtain title to the leaseholds. Knapp thus claims that McFarland is indebted to her in the sum of $77,500, which is one-half of the $155,000 "premium" allegedly due. This cause of action has come to be referred to as the "bonus claim" or the $155,000 claim" or the "155 claim."

McFarland's answer to this cause of action admits an agreement to pay Tanner and Friedman $155,000 but contends that this obligation was conditioned upon his ability to purchase Arlington Towers for no more than $18,425,000. McFarland asserts that the parties agreed that if a greater sum was necessary in order to acquire the Towers, then the $155,000 "bonus" was to be reduced by the legal fees which had been paid or were due to be paid prior to the date of purchase and, further, McFarland maintains that the agreement contemplated that said payment was only to be made when the financial condition of Arlington Towers rendered payment financially feasible and prudent.

In response to McFarland's claim that a reduction was to be made if reacquisition was accomplished at more than $18½ million, Knapp asserts that if this "version" of the contract is found by the court to prevail, then she is entitled to recover $48,641. This figure is derived by deducting from $155,000 the total amount of fees paid or owed to Tanner and Friedman prior to the purchase on August 21, 1965, to wit, $106,309.

#### 2. Second Cause of Action

Knapp's second cause of action (as amended by the withdrawal of certain contingent claims) also alleges that McFarland and Johnson agreed to pay to Tanner and Friedman fees and disbursements for legal services for the period of September 1, 1965 through June 30, 1968 at the rate of $30 per hour for partners and $15 per hour for asso-

ciates; that the remaining unpaid balance on said time charges and disbursements is $75,228.61 of which $37,614.31 (one half) is claimed by Knapp against McFarland. This claim has come to be referred to as the "$30–15 claim," the "30–15" and the "time charges claim."

McFarland's answer admits the agreement to pay at such rates, including disbursements. McFarland, by stipulation, has admitted the reasonableness of this retainer (TR–I–3).[1] McFarland, however, denies that Tanner and Friedman performed all of the legal services that he was billed for, and further contends that certain services, which were rendered, were not properly chargeable to him in that they were not within the scope of the retainer agreement.

### 3. Third Cause of Action

Knapp's third cause of action is an alternative claim to the first claim (i. e., the "1155 claim") and it is based upon principles of quantum meruit. It alleges the purported reasonable value of the legal services rendered by Tanner and Friedman from December 1963 through August 31, 1965 and demands judgment for one-half of the unpaid balance.

### 4. Fourth Cause of Action

Knapp's fourth cause of action is an alternative quantum meruit claim to the $30–15 cause of action.

In addition to various denials to the four causes of action above referred to, McFarland alleges, as an affirmative defense to Knapp's claims, that Tanner and Friedman, as attorneys, breached certain fiduciary obligations to McFarland in various ways and that this bars Knapp from recovery.

### II.

### McFARLAND v. TANNER and FRIEDMAN

On October 6, 1970, McFarland moved this court for an order permitting leave to institute an action against Tanner and Friedman directly (since the assignee would not be responsible therefor) to recoup attorney fees theretofore paid on the grounds, as above referred to, that Tanner and Friedman breached certain obligations during their representation of McFarland. On October 28, this court granted this motion. The caption in this action has been set out by the court to express, in abbreviated form, the actual alignments of the parties and to simplify the analysis of the court in disposing of this entire controversy.

With respect to McFarland's action against Tanner and Friedman, the attorneys deny the material allegations of McFarland's claim and allege further that McFarland's claim does not state a claim upon which relief can be granted and that it is barred by the three year statute of limitations.

### III.

### HISTORY OF THE LITIGATION

Pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, the court, at the commencement of trial, conferred with the respective counsel and directed that Knapp's first and second claims be tried initially along with McFarland's affirmative defenses and claims asserted directly against Tanner and Friedman.

The court deferred the trial of Knapp's third and fourth causes of action, based upon quantum meruit, and reserved decision as to whether (1) the law permits these alternative claims; and (2) the presentation of any evidence on that subject until determination of the foregoing claims which were being tried.

On March 31, 1971, the trial was commenced before a jury. On April 6, 1971, Knapp and Tanner and Friedman terminated the employment of their original trial counsel and requested leave to continue with Friedman as trial counsel.

1. "TR–I——" references are to pages in the trial transcript numbered prior to the testimony of the first witness. Subsequent thereto, the pagination recommenced and the notation "Tr——" is utilized herein to note that change.

The court granted this application, a jury trial being waived by all parties. The jury was thereupon dismissed and the trial continued before the court.

The court, having examined the exhibits, the Proposed Findings of Fact and Conclusions of Law submitted by counsel, and the testimony, makes the following Findings of Fact and Conclusions of Law:

## I. INTRODUCTORY FINDINGS

1. Elizabeth K. Knapp, Arthur S. Friedman and Lester J. Tanner at the commencement of this action were and now are residents of the State of New York (Pretrial Order ("PTO") ¶3(a); TR–I–85). Walter P. McFarland at the commencement of this action was and now is a resident of the Commonwealth of Virginia (PTO ¶3(a); TR–I–85). The respective amounts in controversy exceed, exclusive of interest and costs, the sum of $10,000 (PTO ¶3(a); TR–I–85).

2. Tanner and Friedman now are and at all times pertinent hereto were attorneys at law duly admitted to practice in the Courts of the State of New York and the United States District Court for the Southern District of New York, and, with respect to Friedman, the United States Court of Appeals for the Second Circuit, and practicing their profession in the City of New York as co-partners (PTO ¶3(a); TR–I–95; Tr. 1, 8, 584, 585).

3. On or about May 23, 1969, Tanner and Friedman duly assigned to Knapp their claims against McFarland and Knapp is now the owner thereof (PTO ¶ 3(a); TR–I–104).

4. McFarland and Johnson had certain agreements with a certain group (the "Gregory Group") with respect to an apartment house project in Arlington, Virginia called "Arlington Towers" (the "Towers"). These agreements included a "Memorandum Agreement," under which the Gregory Group gave to the owners [2] of the memorandum rights for a certain time and under various prices to be determined by certain formulas the right to reacquire one or more of the four apartment buildings of the Arlington Towers project (the "Paragraph 9" rights); the right to participate in profits generated by an offer for, or the sale of, the stock and debentures of the corporation owning the entire project (the "Paragraph 7 and 8 rights"); and the right to share in proceeds of, or from, the development or sale of a certain parcel of land called "C Ground" (the Paragraph 6 rights") (Ex. 1).[3] In 1957, litigation was commenced in the name of McFarland, Johnson and one Loughran against the Gregory Group in the United States District Court for the Southern District of New York ("the suit" or "the Gregory action"). In 1961 the Gregory action resulted in a decree of specific performance (the "Original Judgment") in favor of the Gregory plaintiffs and in 1962, in a further decree (the "Supplemental Judgment"). Under the Memorandum Agreement (Ex. 1) and the Original and Supplemental Judgments of the District Court (Exs. 19 and 20), the owners of the memorandum rights had the option for a certain length of time and under certain prices and other terms and conditions, to reacquire one or more of the Tower buildings. At all pertinent times, McFarland indicated his intention to exercise the Paragraph 9 rights (Tr. 27, 32, 273–274, 592).

## II. THE "$155,000 BONUS CLAIM"

5. In or about December, 1963 McFarland and Johnson (the "clients") re-

---

2. McFarland, unquestionably, was an owner of the memorandum rights above referred to. Whether Johnson was a co-owner of those rights, or merely was entitled to an apartment unit in the Towers is a question of fact which this court has not passed upon but which is the principal subject of the "Virginia action" referred to in Finding of Fact 30, infra.

3. Exhibits in evidence are referred to by the notation "Ex. ——."

tained Tanner and Friedman as their attorneys in connection with the enforcement of their claims and rights against the Gregory Group under the Memorandum Agreement and the Original and Supplemental Judgments made by the District Court in the Gregory Action (Answer; PTO ¶ 3(d); Ex. 3; TR–I–86; Tr. 29–30).

6. In September 1964, the "clients" agreed with Tanner and Friedman that:

"(a) The clients would pay for the legal services rendered on their behalf at the rate of $30 per hour for the partners' time, and $15 per hour for the time of associates. And

"(b) The clients would pay for the disbursements expended in connection with the performance of such legal services; and

"(c) In the event Tanner and Friedman achieved 'a good result * * * either by way of litigation or judgment (of the claims of the clients) there would be an upward adjustment of fees based upon achievement.' "

(TR–I–87, 96; Answer ¶ 4; PTO ¶ 3(f); Exs. 7 and 8; Tr. 60–64, 261, 265, 589–590, 969) That fee agreement was conceded to be fair and reasonable to the "clients" (Answer ¶ 4; TR–I–3, 87).

7. In March, 1965, in the Gregory action, Tanner and Friedman applied for certain relief on account of alleged defaults of the Gregory Group under the Memorandum Agreement and the District Court's Judgments. Thereafter, settlement discussions were held among counsel for the parties, in the presence of the District Judge, looking toward exercise by the owners of the Memorandum rights of the Paragraph 9 option or overall settlement of all disputes existing between the parties (Tr. 233–237).

8. The settlement discussion above referred to failed (Tr. 238–240, 292–293, 371); on August 2, 1965 Tanner and Friedman applied in the Gregory action for a Paragraph 9 acquisition of the Arlington apartment buildings. The application was accompanied by a tender signed by McFarland for the buildings at the then Paragraph 9 formula price (approximately $19,900,000), less a credit of $1,000,000 claimed in exchange for a waiver of Paragraph 7 and 8 rights (Tr. 83, 85, 239, 292–293). In anticipation of the Court's refusal to allow such credit as an advance deduction, between August 2 and August 4, 1965 arrangements were made by McFarland and Tanner to borrow an additional $1,000,000 to support a tender at the Paragraph 9 formula price (Tr. 239–240).

9. On August 4, 1965, McFarland, on behalf of the "clients," and Tanner, on behalf of Tanner and Friedman, agreed that if the "clients" reacquired the Arlington apartment buildings at the then Paragraph 9 formula price of approximately $19,900,000, the "upward adjustment of fees" (pursuant to the September, 1964 agreement bonus clause) would be $155,000 (Ex. 9; Tr. 81–88, 297, 369–370).

10. On August 24, 1965, in Arlington, Virginia, McFarland confirmed that $155,000 was the so-called "upward adjustment" of Tanner and Friedman's fee. At the request of McFarland, Tanner and Friedman agreed then to defer a meeting to set a schedule for the liquidation of this $155,000 debt (Tr. 601–603).

11. On August 30 and 31, 1965, the Gregory Group conveyed to McFarland and Johnson, who were represented by Tanner and Friedman, the four Arlington Towers apartment buildings at the then formula price, to wit, $19,900,000 (PTO ¶ 3(g); Exs. 64, 65; TR–I–97; Tr. 105, 240–241, 520, 990).

12. On certain occasions after August 31, 1965, McFarland and Johnson acknowledged that $155,000 was the amount of the additional "bonus" to which Tanner and Friedman were entitled. Thus:

(a) Some time shortly after June 15, 1966, in a conversation relating to time or schedule of payment thereof, McFarland orally acknowledged it to Friedman (Tr. 608–609).

(b) On February 7, 1967, McFarland confirmed it in writing (Ex. 27; Tr. 1083–1085).

(c) At the end of February and the beginning of March 1967, Johnson orally admitted and, in writing, confirmed it (Tr. 947, 1147–1148, 1183; Exs. 25, 26, 28).

13. On March 1, 1967, McFarland received from Tanner and Friedman a draft of a proposed fee letter for his approval and signature regarding the outstanding unpaid fees due to Tanner and Friedman (Tr. 1061, 1063). This draft contained a provision for the payment of "the additional fixed fee of $155,000 (heretofore agreed on in connection with the purchase of Arlington Towers)" (Ex. 26).

On March 4, 1967, Tanner and Friedman sent to McFarland, and he later received (Tr. 946, 1065), a letter stating that Johnson had informed Tanner and Friedman that the March 1 letter (above referred to) embodied McFarland's "understanding of, and agreement to, the terms of that fee arrangement with this firm" (Ex. 28).

It is undisputed that thereafter, bills were served by Tanner and Friedman on McFarland which included the fee obligation of $155,000 of the "clients" (Exs. 25, 26, 28; Tr. 630–631, 941, 946, 1063–1068; see also Defendant's memorandum, page 11, dated May 20, 1971).

14. When McFarland came to New York and met with Tanner and Friedman during the period from March 4, 1967 through June, 1967, he voiced no objection to the aforesaid bills for attorney fees sent to him which included a charge for the $155,000 bonus (Tr. 334, 545–550, 623–633, 782).

McFarland admitted that at no time between March 4, 1967 through November of 1967 did he notify Tanner and Friedman in writing of any objection to the inclusion of the $155,000 bonus in the bills that he received (Tr. 630–633, 1067).

15. McFarland has failed to pay to Tanner and Friedman any part of the $155,000 (PTO ¶ 3(p); TR–I–101). McFarland is liable to Knapp in the amount of $77,500 (one-half) of $155,-000.

## II. THE $30– 15 TIME CHARGES

16. Between September 1, 1965 and June 30, 1968, Tanner and Friedman rendered legal services to McFarland and Johnson under an agreement which provided for the monthly payment of fees at the rate of $30 per hour for partners' time and $15 per hour for associates' time and for disbursements incurred (PTO ¶ 3(h); TR–I–91, 97, 105). That fee agreement for the above-mentioned period (the "time charges agreement") was fair and reasonable to the "clients" (TR–I–3).

17. Between the period of September 1, 1965 and June 30, 1968, Tanner and Friedman actually devoted 7,130 hours, 20 minutes of partners' time and 4,141 hours, 15 minutes of associates' time and rendered bills aggregating $276,028.75 in time charges and $27,992.94 for disbursements (PTO ¶ 3(q); Ex. 12, pp. 35–36; Tr. 120–138). To date, McFarland and Johnson have paid $201,719.25 with respect to time charges and $27,074.13 for disbursements, leaving a claimed remaining balance of $74,309.50 on account of time charges and $918.61 for disbursements (PTO ¶ 3(q); Ex. 57; TR–I–102; Tr. 164–166). McFarland has not paid any part of the foregoing outstanding balance (PTO ¶ 3(q); TR–I–102).

18. On April 23, 1969, Tanner and Friedman agreed with Johnson that Johnson would pay $115,114.31. This figure is one-half of the total sum then claimed by Tanner and Friedman to be due from McFarland and Johnson. Tanner and Friedman expressly accepted this partial satisfaction without prejudice to their claims and rights against McFarland for the remainder of the balance due, which included the "$155,000 bonus" and certain unpaid time charges (PTO ¶ 3(q) 3(r), 3(s); TR–I–102–103).

19. Tanner and Friedman did not charge McFarland and Johnson for any time not actually expended by them or their associates for services which they reasonably believed were necessary for their "clients'" interests and for services which they believed they had been retained to perform (Tr. 345, 391, 563, 745–746, 810, 824, 842–844).

20. Tanner and Friedman properly charged McFarland, and Knapp is entitled to recover for the time rendered by Tanner and Friedman (and their associates) in the application made by Tanner and Friedman to withdraw as counsel and for *in camera* treatment in the Gregory action (Ex. D, pp. 10, 13–14, 25, 29–30, 39–41, 52; Tr. 729–735, 737–739, 782–786, 791–792, 1293, 1334–1335; see discussion, infra).

21. Tanner and Friedman properly billed McFarland and Johnson, and Knapp is entitled to recover for the time devoted by Tanner and Friedman at meetings with McFarland, Johnson and their respective Virginia counsel to consider the impact of the Virginia action on the Gregory action (Ex. 41, diary sheets dated February 27, 28 and March 1, 1967; Ex. 51, diary sheets dated February 27, 28 and March 1, 1967; see discussion, infra).

22. Tanner and Friedman properly billed McFarland and Johnson, and Knapp is entitled to recover for the time rendered by Tanner and Friedman in reviewing Johnson's answer to the complaint in the Virginia action in order to protect certain challenges made by the Gregory defendants to the judgment therein (Ex. 42, diary sheets dated December 13, 14, 15, 1967; Tr. 731–735; see discussion infra).

23. Knapp is entitled to recover for the time devoted by Tanner and Friedman to the Fodiman civil contempt proceedings heard before Judge Dimock during the Gregory litigation (Tr. 767–768).

24. After vacating the civil contempt proceedings against Fodiman, above referred to, Judge Dimock cited Fodiman in criminal contempt and appointed Friedman as "special prosecutor."

Before being relieved of that post, Friedman devoted and billed the "clients" for 34 hours, 55 minutes of partners' time and 87 hours of associates' time, totaling $2,352.50, one-half of which is claimed against McFarland by Knapp ($1,176.25).

The Fodiman criminal contempt proceeding is presently pending in this court before another District Judge.

I find that Knapp's claim for the Fodiman criminal contempt time charges is not sustainable since from the inception of that proceeding to date the court has not ruled that any fine (or part thereof) which may be levied against Fodiman might be awarded to the Gregory plaintiffs or that the court might award attorney fees to the Gregory plaintiffs.

Tanner and Friedman's billing of this amount, however, was made in good faith, without any breach of their fiduciary obligations.

25. The attendance of both Tanner and Friedman at the Equitable deposition was necessary for the proper performance of their representation in the Gregory action and was within the scope of their retainer agreement with McFarland and Johnson. Knapp is entitled to recover for the time devoted by them at that deposition (Tr. 391–393, 745–746; see discussion, infra).

26. McFarland is presently liable to Knapp with respect to unpaid time charges and disbursements in the total sum of $36,839.30. This amount has been calculated by deducting from the total unpaid time charges and disbursements billed against McFarland ($37,614.30) one-half of the unpaid time charges for the services devoted to the criminal contempt proceedings ($775.00) ($37,614.30 minus $775.00 = $36,839.-30). McFarland has already paid $401.25 to Tanner and Friedman regarding the criminal contempt proceedings but has not requested any reimbursement either from Knapp or Tanner and Friedman for this payment.

27. Knapp is entitled to interest on the $77,500 "bonus" from August 31, 1965 to the date of judgment. Knapp is also entitled to interest on the unpaid monthly time charges and disbursements from the time that each monthly time charge became due to the date of judgment. The following is a list of the unpaid time charges and disbursements at the respective monthly due dates from which I find that interest is due:

| Last Day of Month During Which Services Were Rendered or Disbursements Incurred | Monthly Bill to McFarland |
| --- | --- |
| A. Legal Fees | |
| April 30, 1967 | $ 505.63 |
| May 31, 1967 | 5,295.00 |
| June 30, 1967 | 6,870.62 |
| July 31, 1967 | 4,028.13 |
| August 31, 1967 | 4,317.50 |
| September 30, 1967 | 5,658.12 |
| October 30, 1967 | 768.75 |
| November 30, 1967 | 2,565.63 |
| December 31, 1967 | 924.37 |
| January 31, 1968 | 2,993.13 |
| February 28, 1968 | 742.50 |
| March 31, 1968 | 206.87 |
| April 30, 1968 | 121.25 |
| May 31, 1968 | 704.38 |
| June 30, 1968 | 678.12 |
| B. Disbursements | |
| December 31, 1967 | 120.56 |
| June 30, 1968 | 338.74 |

## IV. ALLEGED ADVERSE INTERESTS AND OTHER ALLEGED BREACHES OF FIDUCIARY OBLIGATIONS

28. In 1966 through at least July 1968, Edward P. Johnson was the major stockholder of Ernst and Company, Inc. (Tr. 321, 724).

29. In or about April 1967, Tanner and Friedman learned that disputes had arisen between McFarland and Johnson with respect to Arlington Towers (Tr. 728, 1110–1111).

30. In November 1967, McFarland commenced an action against Johnson in the Circuit Court of Arlington County, Virginia (the "Virginia action") (Ex. 78; Tr. 335, 1270).

31. McFarland's complaint in the Virginia action alleged, among other things, that at the commencement of the litigation with the Gregory defendants, the sole interest of Johnson in the Gregory action concerned his personal apartment lease and that the only person with rights under Paragraphs 7, 8 and 9 of the Memorandum Agreement was McFarland (Ex. 78).

32. When Tanner and Friedman learned of the action filed in Virginia by McFarland in November of 1967, they stated to Virginia counsel for both Johnson and McFarland that Tanner and Friedman and Virginia counsel should meet to discuss and consider the possible impact of the Virginia action upon the New York action (Tr. 791–792).

33. Tanner and Friedman told Virginia counsel for both McFarland and Johnson after the service of McFarland's Virginia complaint that they would be willing to look at any proposed future pleadings in the Virginia action and tell them whether there was any factual inconsistency between said pleadings and the proof adduced in the Gregory action in New York. In the first meeting thereafter held by Tanner and Friedman with McFarland and his Virginia counsel and others, Tanner and Friedman told McFarland that they had read a draft of the Johnson answer (Tr. 731–735, 737).

34. Tanner and Friedman did not place themselves in a position of representing interests adverse to their representation of McFarland in respect to any of the following matters:

(a) Tanner and Friedman's referral of Johnson to a Washington, D.C. attorney to represent Johnson in the Virginia action (Tr. 110, 728–729, 1358–1363).

(b) Tanner and Friedman's compliance with requests from McFarland and Johnson and their respective Virginia counsel to supply documents relating to the Gregory action to Virginia counsel (Ex. K; Tr. 1111, 1363–1364).

(c) Tanner and Friedman's examination of a draft of Johnson's answer to McFarland's Virginia complaint prepared by McFarland's Virginia counsel (Tr. 730–730A, 733–734).

(d) Tanner and Friedman's application to withdraw as counsel for McFarland in the Gregory action on any other aspect of the Gregory suit.

35. Tanner and Friedman represented E. C. Ernst, Inc. ("Ernst") in an anti-trust matter in 1965 and the beginning of 1966, which lasted about five months. Between June, 1966 and about the beginning of 1968, Tanner and Friedman did not represent Ernst on any matter (Tr. 318–319, 336, 726, 1111, 1313).

36. Tanner and Friedman did not represent Ernst on February 28, 1967 or March 1, 1967. At that time they continued to represent the "clients" exclusively and pursuant thereto, they with Joseph McCarthy, counsel for Ernst, drafted a proposed option for McFarland and Johnson which, if signed, would have entitled Ernst to acquire either or both of McFarland's and Johnson's interests in Arlington Towers. This option-draft was never signed by McFarland (PTO ¶ 3(g); TR–I–97; Exs. 58, 64, 65; Tr. 105, 240–241, 319, 323, 520, 725, 726, 765, 944, 990, 1093, 1111, 1147, 1182–1187, 1199, 1274, 1313).

37. Neither Tanner nor Friedman communicated with McFarland while they were in Washington, D.C. on February 27–March 1, 1967. They had every reasonable expectation that in connection with the said option agreement they were representing the mutual interests of both Johnson and McFarland and that there was no reason to communicate separately with McFarland (Tr. 556, 619, 763, 1128, 1155, 1173–1174, 1184–1186, 1315).

38. In June 1966, in the Gregory action, Judge Dimock of this Court ordered that there be a trial on the issue of damages recoverable from the Gregory defendants (Ex. 12, p. 6; Tr. 933). Trial of the said damage claims in the Gregory action commenced about December 5, 1966 and continued until July 1967; at that point the Gregory defendants moved to dismiss the claims for failure of proof (Ex. 12, pp. 13, 20; Tr. 313, 933).

39. In January, 1968, after the Gregory defendants had moved to reopen plaintiffs' case and to offer into evidence a copy of McFarland's Virginia complaint on the ground that its allegations were inconsistent with testimony given by McFarland and Johnson in support of the claims against the Gregory Group, Tanner and Friedman made an application to the United States District Court for the Southern District of New York for leave to withdraw as McFarland's attorneys in the Gregory action, claiming (1) there was a conflict of interest between their then clients and (2) conflicting instructions from McFarland and Johnson to Tanner and Friedman pertaining to the conduct of the Gregory action and the response to be made to the said motion to open (TR–I–99, 100; Ex. 81; Ex. D, pp. 14, 15, 24; Tr. 128, 335, 791, 1293, 1334–1335).

40. On January 30, 1968, Tanner and Friedman's application to withdraw as attorneys for McFarland in the Gregory action came on before Judge Dimock of this Court for hearing. Upon application of Tanner and Friedman, Judge Dimock ruled that the attorneys for the Gregory defendants should be excluded on the argument of the application of Tanner and Friedman to withdraw as counsel for McFarland (Ex. C, pp. 16,652–16,653, 16,690–16,691). The hearing on Tanner and Friedman's application to withdraw as counsel for McFarland in McFarland, et al. v. Gregory, et al. was held before Judge Dimock on January 31, 1968 (Ex. D, p. 1).

On January 31, 1968, after noting—

(1) that the rights prosecuted in the Gregory action in New York were in McFarland's name although ownership thereof might have been shared with other (Ex. D, pp. 21, 29–30),

(2) that the interests of McFarland and Johnson *inter sese* were not then and had not theretofore been before the District Court (Southern District of New York) for determination and would not be determined therein (Ex. D, pp. 10, 13–14, 25, 29), and

(3) that there was no conflict between the prosecution of the rights against the Gregory group and the *inter sese* dispute between McFarland and Johnson in the Virginia action with respect to ownership thereof (Ex. D, pp. 10, 13–14, 25, 29–30, 39–41, 52), Judge Dimock denied Tanner and Friedman's motion to withdraw as McFarland's attorneys (TR–I–99, TR–I–100; Tr. 335).

41. Tanner and Friedman's refusal to comply with McFarland's February, 1967 request to provide an itemized bill of all monthly time charges rendered to McFarland and retained by him, without protest, from September, 1966 through January, 1967 did not constitute a breach of their attorney's obligation of candor and full disclosure because McFarland's request was not made in good faith or in the ordinary course of business and because Tanner and Friedman had already given McFarland an explanation in great detail (Exs. 15, 60, 66A, 67).

42. There is no evidence in the record that any act alleged by McFarland to have been performed by Tanner and Friedman in breach of their obligations as attorneys caused any damage to him.

## DISCUSSION

### I. THE SEPTEMBER, 1964 FEE AGREEMENT IS ENFORCEABLE

■ McFarland claims that the September, 1964 agreement which contains the bonus provision is not enforceable in that it allegedly is "a mere agreement to agree." Specifically, McFarland challenges the following language:

"It is also our understanding that if we [Tanner and Friedman] are successful in achieving a good result, either by way of litigation or settlement of this dispute, there will be an upward adjustment of fees, based upon achievement." (Ex. 7)

McFarland's argument is both factually and legally untenable.

First, with respect to the facts, McFarland misconstrues the nature of Knapp's claim. This action is not predicated alone upon the enforcement of the above language. This is not an action prosecuted because of the unwillingness of McFarland to agree to what a "good result" or "upward adjustment" should consist of. Instead, this action is based upon the enforcement of the fee arrangement of September, 1964 as supplemented by the understanding reached by the parties on August 4, 1965. Thus, although the above language contemplated and required further specification in order to be enforceable, the parties subsequently supplied the equivocal undefined terms.

McFarland's contention is also factually inconsistent with another position advanced by him during this litigation. Since the inception of Knapp's suit, McFarland has claimed that Knapp's alternative quantum meruit cause of action to the first claim must be dismissed as a matter of law on the grounds that an "express contract," to wit, the September, 1964 agreement, already "covered" this claim. McFarland, thus, has always advanced the contention that the September, 1964 fee agreement was legally sufficient and enforceable for the purpose of interposing his defense to the quantum meruit cause of action.

The terms of the bonus clause are an integral part of the entire retainer agreement and, therefore, cannot be severed from it. Clearly, the terms of the contract are interrelated: "It is *also* our understanding that if we are successful * * * there will be an adjustment * * *." Moreover, the evidence discloses that the intent of the parties was not to negotiate severable and independently enforceable terms but, rather, Tanner and Friedman were willing to agree upon a minimum time charges rate because the opportunity for further compensation in the form of a "bonus" was expressly included in the contract.

■■ The applicable law also disposes of McFarland's argument. Regard-

less of the validity of the general proposition that "agreements to agree" are illusory and, therefore, unenforceable, this principle has no application in the context of interpreting employment contracts which include open additional compensation clauses. The New York cases reveal that (1) where parties enter into an agreement providing for certain immediate compensation to be paid and also provide for a subsequent upward adjustment of that compensation, to be determined at a later time, the contract is enforceable; and further (2) that if the parties fail to definitively reach an understanding as to what shall constitute the premium, the court will determine an appropriate bonus rather than deem the contract unenforceable. See Pillois v. Billingsley, 179 F.2d 205 (2nd Cir. 1950); Heller v. Kalish, 141 App. Div. 205, 125 N.Y.S. 1057 (First Dept. 1910), and Plattenburg v. Briggs, 166 App.Div. 326, 151 N.Y.S. 925 (Third Dept. 1915).

Two additional points distinguish several of the pertinent cases cited by McFarland. First, in suits (such as the present one) predicated upon the enforcement of agreements for services which have been fully performed prior to the commencement of the action, the courts are more inclined to characterize such contracts as enforceable. Pillois v. Billingsley, supra. Secondly, the terms of the instant agreement state that a premium "will" be paid based upon the occurrence of a "good result"; thus, the language of the contract did not leave McFarland with the unilateral option to capriciously refuse to award a bonus, although it admittedly left the amount undetermined until the value of the services to be rendered by Tanner and Friedman could be assessed. Leighton v. New York, S. & W. Ry. Co., 303 F. Supp. 599 (S.D.N.Y.1969), illustrates this principle. In that case the plaintiff (attorney) and defendant (client) advanced conflicting contentions as to the meaning of the "achievement" required for the plaintiff to recover a fee. The client asserted that his counsel had to obtain permission for the discontinuance of all passenger service in order to recover, whereas the plaintiff contended that the standard was lower. The Court held that it would determine what the parties contemplated by the term "achievement" rather than deem the contract unenforceable. The Court ruled that a definite pecuniary benefit to the client was the "good result" contemplated. The client therein also claimed that the contract was unenforceable for an additional reason—the parties had failed to fix a definite amount of compensation for the legal services performed. The Court, nonetheless, held that the contract was enforceable and proceeded to determine an equitable amount based upon the value of the benefit to the client.

## II. THE $155,000 BONUS CLAIM

### 1. The August, 1965 Letters

On August 16, 1965, McFarland wrote Tanner that he agreed to pay the $155,000 bonus with the proviso that payment be deferred. He requested Tanner and Friedman's acceptance (Ex. 10). Instead of so doing, Tanner and Friedman sent a letter, dated August 18, 1965 (Ex. 11), purporting to "bridge the difference" between the parties on the question of the "time for payment of the fees upon which we have agreed." The letter set forth a schedule for the liquidation of McFarland's debts to Tanner and Friedman and requested that McFarland confirm the schedule; none followed. On August 24, 1965, Friedman visited McFarland; McFarland asked Tanner and Friedman to defer setting fixed payment dates until the financial status of Arlington Towers could be assessed and a workable tempo for liquidating the debt could be arranged. Tanner and Friedman each agreed.

McFarland contends that the above exchange of letters constitutes a series of offers and counteroffers, which do not manifest a binding agreement. McFarland is incorrect for two reasons: First, Knapp has never contended that

this series of letters constitutes a bonus contract; her position has always been that on August 4, 1965, McFarland orally agreed to pay the bonus and that written confirmation was never requested by McFarland. The evidence disclosed that after McFarland agreed to pay the bonus, he attempted to repudiate the contract by insisting that a deferment in payment be arranged. These attempts, however, do not abrogate the binding contract theretofore made. 1 Corbin On Contracts § 85, p. 367. Second, when the letters (Exs. 9, 10 and 11) and conversations of the parties are analyzed to determine whether they eventually reached a mutual understanding, the same conclusion follows—a binding agreement was made.

McFarland claims that although he stated in his letter of August 16 that " * * * [McFarland and Johnson] agree in substance to pay the extra fees," he did not unconditionally bind himself because he interposed the deferment in payment. Nevertheless, expressions of assent by an offeree, which contain immaterial deviations from the original offer, do not constitute counteroffers but, rather, operate to bind the parties to an enforceable contract. 1 Corbin On Contracts § 84, p. 365, n. 5. See also U.C.C. 2–207, which states:

"(1) A definite seasonable expression of acceptance * * * operates as an acceptance although it states terms additional to those offered or agreed upon."

McFarland's statement in his letter of August 16, 1965 (Ex. 10), that he agreed to the bonus, manifests his acknowledgement that the bonus was then due and his willingness to pay it at some time. His request for a deferral in payment was immaterial to the validity of his assent; clearly the parties had never before predicated the *existence* of their fee arrangements upon the time of payment.

Furthermore, notwithstanding any previous unresolved question as to the time of payment, the August 24, 1965

discussion between Friedman and McFarland settled this point, to wit, Tanner and Friedman withdrew their insistence upon setting a definite schedule for payment of McFarland's debts.

**2. *Claim That McFarland Would Not Have Agreed to Payment of a Bonus If Reacquisition Required More Than $18,425,000***

Another major contention that McFarland has advanced to dispute the claim that he agreed to the bonus is his assertion that when the contemplated $18,425,000 settlement with the Gregory defendants collapsed, the reason for payment of the additional fee had disappeared. He claims that if he had to pay more than that settlement figure, there was no reason to consider paying Tanner and Friedman a premium (Tr. 938).

In analyzing this position, the critical fact to note is that by August, 1965, McFarland knew that he would have to pay $19,900,000 in order to purchase Arlington Towers. With this in view, contrary to McFarland's contention, the record discloses that:

1. When McFarland originally took the stand, he related that his first and *only* response to Tanner's letter of August 5, 1965 (Ex. 9) was his letter of August 16, 1965 (Ex. 10). On cross-examination, however, he recalled that he did discuss the August 5, 1965 letter on August 10 and told Tanner the "bonus" was a dead issue which he "did not want to hear any more about." Nevertheless, on August 16, 1965, McFarland wrote to Tanner (Ex. 10), without mention of the discussion of August 10, nor even intimating that the bonus question was a "dead issue." The letter proceeded, in substance, to acknowledge that a bonus was to be paid.

2. McFarland's letter of August 16, 1965 (Ex. 10) made no mention of Tanner's statement that Tanner was "confirming" an "understanding" which, if reached, would have been made prior to August 5, 1965.

3. McFarland admitted that after the aborted July settlement conference he

agreed to pay Tanner and Friedman a bonus if Arlington Towers was reacquired for more than $18½ million (Answer, ¶6; Tr. 987). Thus, by McFarland's own admissions, there at least must have been some reason to pay a bonus (however large or small) when the reacquisition price increased.

4. The prime objective of McFarland from the inception of his relationship with Tanner and Friedman was to obtain the conveyance of the Towers, which by McFarland's own estimation had a market value of about $25 million. Indeed, he devoted eleven years of litigation, including several appeals, to accomplish that objective.

### 3. McFarland's Affirmative Acknowledgments and Admissions by Silence

McFarland's own admissions constitute additional proof that Knapp's version of the bonus contract is the more persuasive one.

Friedman testified that after Judge Dimock awarded damages of $700,000 plus the "C Ground" proceeds to McFarland, Tanner and Friedman again attempted to reduce the $155,000 debt by the application of some of these funds. Although McFarland denied having this discussion, his letter to Harold Ungar, dated February 7, 1967 (Ex. 27), confirmed the fact that Tanner and Friedman had proposed to McFarland a schedule for liquidation of his entire debt, including the bonus. In the same letter McFarland admitted that he had agreed to pay a bonus and was apparently principally disconcerted by the attorneys' insistence upon immediate payment (Ex. 27, ¶15 of the so-called "History"). In another section of the letter, McFarland again acknowledged the debt (Ex. 27, ¶14 of the "History").

After McFarland in Exhibit 27 supplied the "History," above referred to, he proposed to Ungar a method of adjusting his debts for legal services with Tanner and Friedman:

"4. This arrangement assumes a substantial sum to be received by Plaintiffs in damages. If not, the $155,000 as originally agreed, would be paid only when the economical and cash picture would so permit in the opinion of Walter P. McFarland."

McFarland argues that the above reference to "the $155,000 payment, as originally agreed," relates to his agreement in July of 1965 to pay a bonus when the price of acquiring the Towers was $18½ million. This assertion, however, is incorrect for paragraph 4 above relates McFarland's concern for tying the payment of the $155,000 to the economic feasibility of liquidating his debts—a problem which he did not encounter until *after* he had acquired Arlington Towers.

■ McFarland, by his failure to reply to several periodic statements of fees due (including the $155,000 bonus), submitted by Tanner and Friedman, admitted the propriety of this charge.

The controlling cases make clear that where a relationship of "creditor" and "debtor" exists, such an attorney-client relationship, with a regular course of rendering bills for services performed, the client-debtor's retention of those statements, without dispute, is deemed an admission of their accuracy.

Thus, in Hellenic Lines Ltd. v. Gulf Oil Corp., 340 F.2d 398 (2nd Cir. 1965), the Appellate Court held that a letter containing the creditor's assertion that the debtor was bound to perform a disputed agreement indicates an admission by silence when the debtor failed to object or dispute that contention after a reasonable length of time elapsed (see Hellenic at p. 401).

This principle has been applied by the New York Courts in cases involving actions for attorney fees. Knapp correctly cites Rodkinson v. Haecker, 248 N.Y. 480, 485, 162 N.E. 493, 495 (1928) for this principle.

"As a general rule where an account is made up and rendered, he who received it is bound to examine the same or to procure someone to examine it for him. If he admits it to be correct, it becomes a stated account and is

binding on both parties. If, instead of an express. admission the party receiving it keeps the same by him and makes no objection within a reasonable time, his silence will be construed into an acquiescence in its justness, and he will be bound by it as if it were a stated account."

See also Steingart Associates, Inc. v. Sandler, 28 A.D.2d 801, 803, 280 N.Y.S. 2d 1012 (Third Dept. 1967).

McFarland asserted that he did not remain "silent" but expressed his protest to Tanner and Friedman. McFarland's recollection, however, was vague and confused and I am not impressed with the credibility of these statements. Moreover, he admitted that he never expressed any objection to Johnson. Although McFarland was a prolific letter writer, he testified that he did not protest in writing to Tanner and Friedman until nine months after the fee statements were submitted to him.

### III. THE $30–15 TIME CHARGES

Knapp's second cause of action (as amended by the withdrawal of certain contingent claims) alleges that McFarland and Johnson are liable for unpaid time charges and disbursements incurred during the period of September 1, 1965 through June 30, 1968. The language of the retainer covering this period states that Tanner and Friedman were to render legal services to their clients "in further prosecution of the Suit, matters ancillary thereto and litigations on and relating to the operation of the Arlington Towers project." (TR–I–89)

McFarland assails this claim on two grounds: First, he contends that he was charged for time which was not actually expended, i. e., "padded time," and was billed for "unnecessary and duplicative services." Secondly, McFarland claims that he was charged for certain services which, although performed, were not within the scope of the retainer as outlined above.

With respect to the contention that Tanner and Friedman rendered "padded" bills, the evidence does not sustain this charge. Although McFarland elicited on cross-examination that in several instances these attorneys failed to sign the register when entering the office building during periods of time which they charged McFarland for, the proof disclosed that Tanner and Friedman did not have a systematic routine or a business policy of signing the register upon entering the building but, rather, of signing only when the security attendant so requested.

Moreover, the diary entries made by these attorneys disclose that Tanner and Friedman frequently worked on problems for their clients at home. Five separate attorneys connected with the firm testified that they never recorded anything in their time records which did not accurately and truthfully reflect the time devoted to McFarland's interests (Tr. 563, 825, 835, 843). When McFarland offered a copy of a diary entry of Tanner (Ex. J) made on October 23, 1966 in an attempt to prove that *one* hour of the time charged on that day was fabricated, this alleged disparity was disputed by testimony that Tanner devoted an additional hour out of his office (Tr. 347, 348, 567).

One claim of alleged "unnecessary and duplicative services is the so-called "Equitable depositions," conducted in the Gregory action. McFarland contends that Tanner's attendance of 69 hours in addition to Friedman's constitutes "double representation."

McFarland's assertion is, however, without merit. The manner of conducting the course of litigation, including examinations before trial, is largely within the discretion of an attorney, subject to principles of good faith and the Canons of Legal Ethics. McFarland has not challenged Tanner and Friedman's bona fides. It is indisputable that the Gregory action involved complex issues of law and fact requiring legal experts who specialized in particu-

lar phases of the law. Although Friedman was the principal trial counsel, it is clear that Tanner's knowledge with respect to tax matters and general familiarity with the previous details of the lengthy action reasonably justified his presence. Moreover, the testimony, and particularly letters to Tanner and Friedman, disclosed that McFarland was aware of the necessity of engaging both Tanner and Friedman in the preparation for trial and that from time to time McFarland urged their joint efforts (Tr. 397–398).

The second type of challenge which McFarland makes to the time charges concerns services which were admittedly performed but which McFarland contends are not chargeable to him.

### 1. Tanner and Friedman's Motion to Withdraw as Counsel

The application to withdraw as counsel was made in January, 1968, after and as a result of McFarland's Virginia suit against Johnson claiming that McFarland alone was the exclusive owner of the Memorandum rights in Arlington Towers prior to August 31, 1965. Despite this assertion, the record in the Gregory proceedings in this Court reveals that McFarland had testified therein that other persons, including Edward Johnson, had an interest in those rights (see testimony of McFarland at the following pages in the Gregory "compensation" case: pp. 15,010–15,012, 15,022–15,023, 15,565–15,566). Hence, the immediate effect of the commencement of the Virginia action on the Gregory suit was a motion by the Gregory defendants to reopen their case to apprise the Court of McFarland's apparently inconsistent positions (see Gregory compensation case, pp. 16,617 et seq.).

Notwithstanding that action by the Gregory defendants, McFarland instructed Tanner and Friedman to defer action of that motion; Tanner and Friedman, however, considered it imperative under the Canons of Legal Ethics to immediately notify the Court of the apparent discrepancy.

An additional difficulty confronted Tanner and Friedman which independently impelled their motion to withdraw. On January 4, 1968, Tanner and Friedman were given conflicting instructions by McFarland and Johnson as to the approach to utilize in opposing the Gregory defendants' motion to reopen the case (Tr. 128, 791, 1293, 1334–1335).

Under the circumstances, then, it was reasonable, and perhaps obligatory, for Tanner and Friedman to notify the Court of their predicament. Since the motion to withdraw was not precipitated by their own conduct, but, rather, by their clients' action, albeit honestly motivated, the time charges involved are clearly compensable.

This Court is cognizant of the fact that Judge Dimock refused to grant the application to withdraw. In so doing, however, Judge Dimock premised his decision upon the fact that he had no jurisdiction to litigate the rights of McFarland and of Johnson *inter sese*. In ruling upon the motion, the Court did not have to consider whether McFarland's testimony was, in fact, inconsistent since it initially concluded that McFarland alone was the sole nominal plaintiff in the compensation proceedings.

McFarland can take no refuge in the fact that he opposed the motion to withdraw as counsel. McFarland claimed that he was the exclusive owner of the Memorandum rights but insisted that there was no reason for a withdrawal. McFarland, however, was willing to permit the withdrawal provided that Tanner and Friedman also were relieved as counsel to Johnson.

### 2. Review of the Potential Impact of the Virginia Complaint Upon the Gregory Action, Including a Review of Johnson's Answer

The potential impact upon the Gregory action of the allegation made by McFarland in the Virginia suit has already been outlined. The proof disclosed that Tanner and Friedman had no knowledge of the institution of the Vir-

ginia suit until after its inception. Tanner and Friedman reasonably believed that McFarland's complaint had complicated, if not jeopardized, the Gregory judgment. It was for the purpose of avoiding jeopardizing the very litigation which Tanner and Friedman had been retained to prosecute that led to the advice by Tanner and Friedman to McFarland and Johnson (and their Virginia counsel) to permit the New York attorneys to examine the pleadings and analyze whatever implications might arise (Tr. 731–735). Indeed, Tanner and Friedman may well have been remiss in their duties had they not considered the possible adverse implications.

The evidence failed to disclose that Tanner and Friedman assisted in the preparation of the drafts or did anything except to read the documents with a view of preserving what they believed to be the mutual interests of McFarland and Johnson in the Gregory action (Tr. 731–735). Consequently, McFarland and Johnson were properly charged for the time so expended.

### 3. The Draft of the Ernst Option and the Ernst Option Meetings

█ On Monday, February 27, 1967, Tanner and Friedman traveled to Washington at the request of Johnson to discuss the possibility of settling the arrearages in payments of the "clients." At that time Tanner and Friedman had no knowledge that an option agreement would be proposed whereby E. C. Ernst, a corporation principally controlled by Johnson, would purchase the interests of either or both McFarland and Johnson. It is undisputed that at that time McFarland and Johnson collectively owned Arlington Towers and had retained Tanner and Friedman to represent them in matters relating to the property. When Tanner and Friedman arrived in Washington, D. C., they were informed by Johnson that McFarland had requested the preparation of an option for the sale of Arlington Towers to Ernst and Company, setting a purchase price of $3 million for McFarland's interests. While

McFarland admitted the receipt of this document on the following day, he denied that he requested its preparation. Contrary to McFarland's contention, however, the record disclosed that he had expressed an interest in selling his rights in Arlington Towers to Ernst and Company (indeed, he so admitted in his Virginia complaint) (Ex. 78, pp. 1209–1211) and requested the preparation of the option. The document was delivered to McFarland within the twenty-four hour period requested by McFarland and without any explanatory covering letter (Tr. 939, 1273–1274).

Furthermore, it is clear that at least after August 31, 1965, McFarland and Johnson were partners in the operation of Arlington Towers (Ex. 58) and that Tanner and Friedman were retained for their mutual benefit. In such an instance, the law clearly permits one partner (Johnson) to bind the other for legal expenditures with respect to property mutually owned.

### 4. Fodiman Contempt Proceedings

The Fodiman contempt proceedings were hearings which originated in connection with a subpoena duces tecum which was served by the Gregory plaintiffs upon Horn, an accountant employed by the Gregory defendants. Horn refused to comply with the subpoena at the advice of one of the Gregory defendants' counsel, Aaron R. Fodiman (Tr. 767–768).

In response, Judge Dimock adjudged Fodiman in civil contempt and levied a fine which included an award of attorney fees of $1,000 per day for the time expended in prosecuting the civil contempt, payable to the plaintiffs in the Gregory action. Clearly, then, the efforts of Tanner and Friedman in conducting the prosecution of the civil contempt proceedings were performed in pursuit of the pecuniary interests of their client (i. e., the fine) and Knapp is entitled to recover therefor although the court subsequently vacated the judgment on procedural grounds.

Thereafter, Judge Dimock directed that a criminal contempt proceeding be instituted against Fodiman and appointed Friedman as "special prosecutor," for which Knapp now claims payment for the unpaid time charges incurred.

McFarland claims that Judge Dimock's appointment of Friedman was not requested by him and that Friedman served exclusively as an officer of the court to vindicate an affront to its dignity for which compensation from McFarland is unwarranted.

Knapp asserts that Friedman's services were directed to insure the future compliance of other subpoenas which were (then) to be served in litigating the Gregory matters. Knapp, therefore, claims that the attorney's efforts directly contributed to the success which the plaintiffs in the Gregory action ultimately enjoyed.

Knapp advances the additional argument that any criminal fine which may be assessed against Fodiman would be, as is occasionally the case, payable to a party, here McFarland. (See, for example, Searls v. Worden, 13 F. 716 (E.D. Mich.1882), rev'd on other grounds 121 U.S. 14, 7 S.Ct. 814, 30 L.Ed. 853 (1886) and Parker v. United States, 153 F.2d 66, 71 (1st Cir. 1946).) Knapp thus claims that although the jurisdiction of the Court altered, Friedman's efforts continued to be a reasonable and necessary expenditure of time in pursuit of his client's pecuniary interests.

The principal difficulty in reaching this position lies in the fact that neither Judge Dimock nor Judge McGohey (who is presently presiding in this matter) ruled that any fine imposed upon Fodiman would be payable to McFarland. It is still speculative as to whether Friedman's appointment as special prosecutor was for the potential financial benefit of McFarland.

## IV. AFFIRMATIVE DEFENSE AND CLAIM FOR REPAYMENT

As previously stated, McFarland has alleged that Tanner and Friedman performed services for adverse interests. More specifically, McFarland alleges that Tanner and Friedman represented the interests of Johnson and E. C. Ernst & Co. in violation of their duty of individual loyalty to McFarland.

This claim is raised as an affirmative defense to Knapp's contract claims and as a claim to recover past fees paid by McFarland to Tanner and Friedman. The other alleged breaches of duty that form the basis of the claim are McFarland's contentions that Tanner and Friedman falsified the number of hours they expended and that Tanner and Friedman charged McFarland for unnecessary and duplicative services. We have dealt with these latter two claims in our discussion of the main case, and so our discussion here of the affirmative defense and claim for repayment of fees will center only on a consideration of the claim of adverse interest.

McFarland has alleged a number of acts as evidencing the representation by Tanner and Friedman of interests adverse to those of the defendant-client. This court, however, is unconvinced. McFarland's proof demonstrates nothing more than that Tanner and Friedman found themselves in an increasingly more difficult position as the relationship between their co-clients deteriorated, while they endeavored to fulfil their duty to both clients.

McFarland's argument seems to be based on a contention that Tanner and Friedman represented McFarland and Johnson as clients with separate and distinct interests in Arlington Towers. However, it is quite apparent from the record and in fact, stipulated at the trial (TR–I–86) that McFarland and Johnson acted jointly in the retaining of Tanner and Friedman to represent their mutual interests in Arlington Towers.

Thus, although McFarland places great emphasis on the fact that Tanner and Friedman dealt with Johnson in the preparation of the Ernst option on February 28 and March 1, 1967, there is

nothing to indicate that this was done in derogation of McFarland's interests. Tanner and Friedman had been representing McFarland and Johnson as co-owners in matters relating to the Virginia property. The fact that they dealt with only one of the co-owners in the preparation of the option hardly indicates a conspiracy against the rights of the other co-owner, even though Ernst & Co. was owned by Johnson. There is no evidence which indicates that Tanner and Friedman should, at that point, have realized that the relationship between McFarland and Johnson had been altered.

Moreover, there is evidence to conclude that McFarland had indicated his own interest in the sale to Ernst & Co. Thus, there was further reason for Tanner and Friedman to believe that they were representing the interests of both clients in the drafting of the opinion. Additionally, Ernst was represented at all relevant times by its house counsel, Joseph McCarthy. Finally, it must be remembered that the document which Tanner and Friedman drafted was nothing more than an option which was to be submitted to McFarland on the very next day for his review. McFarland's position here comes down to a contention that Tanner and Friedman should have rejected a request by one of their clients to prepare a draft of an option for the submission to both clients. This concept of the duties of an attorney is difficult to accept.

McFarland's other contentions as to representation of adverse interests are equally unsubstantial. He points to the fact that Tanner and Friedman supplied Johnson or his attorneys in the Virginia action with certain papers. These papers pertained to the 1965 acquisition of Arlington Towers and were papers of record in the Gregory litigation. Since Tanner and Friedman represented both McFarland and Johnson in that matter, Johnson had every right to those papers. Failure by Tanner and Friedman to supply those papers might in fact have amounted to a breach of their professional duties.

Equally frivolous is McFarland's reliance upon the fact that Tanner and Friedman supplied Johnson with the name of an attorney to whom he could speak in relation to his problem with McFarland. This was merely part of Tanner and Friedman's effort to avoid being drawn into the Virginia dispute themselves and thereby avoid any possible ethical impropriety.

McFarland next points to the fact that Tanner and Friedman reviewed a draft of Johnson's answer in the Virginia litigation. Tanner and Friedman offered to review the pleadings of both sides and it was done merely to avoid having papers submitted in the Virginia action which would compromise their clients' position in the New York action.

This leaves us finally with the attempt by Tanner and Friedman to withdraw as counsel in the New York action. McFarland's contention here is that this application was not so much a withdrawal as an attempt by Tanner and Friedman to have the Judge rule that Johnson had an interest in the New York action. This is not supported by the evidence. Tanner and Friedman were faced with an obvious rift between their clients and it was counsel's belief that if they continued to represent both McFarland and Johnson they might be opening themselves up to charges of the exact sort that are now being levelled against them. Thus they sought to be relieved.

I conclude that there is nothing to indicate that Tanner and Friedman represented interests adverse to McFarland and Johnson. This affirmative defense must fail and the claims for repayment of fees paid must be dismissed.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and of the parties herein pursuant to 28 U.S.C. § 1332(a).

## I. THE $155,000 AND UNPAID TIME CHARGES CLAIMS

2. The September, 1964 retainer agreement between Tanner and Friedman and Johnson and McFarland is valid and enforceable.

3. The assignment of Tanner and Friedman's claim to Knapp against McFarland is valid and enforceable.

4. McFarland is indebted to Knapp in the sum of $77,500 on the bonus claim.

5. McFarland is indebted to Knapp in the sum of $36,839.30 on account of unpaid time charges.

6. Knapp is entitled to judgment against McFarland in the total sum of $114,339.30, with interest.

7. Knapp's third and fourth alternative claims for recovery based upon quantum meruit are dismissed.

## II. THE ADVERSE INTERESTS AND BREACHES OF FIDUCIARY OBLIGATIONS CLAIMS

8. Tanner and Friedman had the obligations, as attorneys, to represent McFarland with undivided loyalty, fairness, and without any interests adverse to him; at no time did they breach any of these obligations. Canons of Legal Ethics, 6, 16, 22, 32, 41, 44; Eisemann v. Hazard, 218 N.Y. 155, 112 N.E. 722 (1916); Re: Bond and Mortgage Guarantee Co., 303 N.Y. 423, 431, 103 N.E.2d 721 (1952); Matter of Trybom, 168 Misc. 484, 6 N.Y.S.2d 29 (Sur. Co., Westchester Co., 1938); Matter of Youngentob, 181 App.Div. 490, 493, 168 N.Y.S. 961 (First Dept. 1918); Matter of Dix, 21 Misc.2d 864, 201 N.Y.S.2d 293, aff'd 11 A.D.2d 555, 199 N.Y.S.2d 957 (1916).

9. Tanner and Friedman billed McFarland and Johnson in good faith for the Fodiman criminal contempt time charges and did not breach their fiduciary obligations by rendering this statement.

10. McFarland has failed to prove his affirmative defenses against Knapp. Tanner and Friedman are entitled to the dismissal of all claims asserted against them by McFarland.

11. Knapp and Tanner and Friedman are together entitled to one bill of costs since their interests, as assignee-assignor in the litigation of the contract claims as well as the affirmative defenses and reimbursement claims are identical.

Settle judgment on notice pursuant to the foregoing.

## MEMORANDUM and SUPPLEMENTAL FINDING OF FACT

Pursuant to the opinion of this court, dated July 1, 1971, counsel for Knapp and Tanner and Friedman have presented a judgment for signature and entry. Counsel for McFarland has interposed one objection thereto by letter dated July 7, 1971, contending that the issue of the reasonableness of the $155,000 bonus agreement remains unresolved.

At the conclusion of trial, the court stated to the respective counsel that "this [trial] relates to *all* matters as to whether or not the $155,000 specific fee is sustained." Additionally, this court has found (Finding of Fact 5) and McFarland has admitted (Answer ¶ 4; PTO ¶ 3(f); TR–I–3, 87) that the September 1964 fee agreement, which included a provision for a bonus, was fair and reasonable. Nonetheless, in order to clarify this matter, the following additional Finding of Fact is hereby made to supplement the opinion of July 1, 1971:

## SUPPLEMENTAL FINDING OF FACT

6A. The said $155,000 bonus contract is a fair and reasonable compensation agreement and was understood as such by McFarland when made (August 4, 1965).

The record clearly supports this finding. (1) At the time that the $155,000 bonus contract was agreed upon, Tanner and Friedman had already performed 20 months of legal services for McFarland, including negotiations

regarding, and litigation of, the Gregory action. (2) The attorneys were instrumental in obtaining additional finances at a critical time in order for McFarland to achieve his objective—reacquisition of Arlington Towers after 11 years of litigation (see opinion, p. 613). (3) Tanner and Friedman's efforts resulted in an accomplishment which afforded McFarland a substantial economic benefit, that is, reacquisition of $19.9 million of property *valued by McFarland* at about $25 million.

McFarland clearly was aware that the bonus agreement was fair and reasonable when he made the agreement. (1) His business sophistication and acumen have already been noted by the court (see p. 615 of opinion). (2) Throughout most of the relationship with Tanner and Friedman, McFarland made suggestions as to the conduct of the litigation and, at times, directed the course to be followed (see p. 616 of opinion). (3) It is worthy to note that the $155,000 contract was a related and coordinate part of the $30–15 time charges agreement and that Tanner and Friedman were willing to agree upon minimum time charges because *McFarland* offered a "bonus" as additional compensation for their services. Clearly, then, McFarland knew that the agreement was fair and reasonable and at no time did he otherwise contend.

Accordingly, I have signed the judgment presented by counsel for Knapp and Tanner and Friedman.

So ordered.

## OPINION, FINDINGS OF FACT and CONCLUSION OF LAW

### AFTER REMAND from 457 F2d 881.

Upon an opinion, findings of fact and conclusions of law dated July 1, 1971 and a memorandum and supplemental finding of fact dated July 9, 1971, this court directed a judgment in favor of Knapp, assignee of Tanner & Friedman, in the total sum of $114,339.50. $77,500 was on account of one-half of the so-called bonus claim of $155,000 and $36,839.30 was on account of one-half of the unpaid time charges, together with interest thereon to date of judgment.

The essential facts are set forth in detail in my opinion rendered after a non-jury trial.

As a result of the appeal and the cross-appeal, the Court of Appeals made the following determinations:

1. The dismissal of McFarland's defense and counterclaim against Tanner & Friedman, assignors to Knapp, was affirmed.

2. The District Court's award to Knapp for services provided by Tanner & Friedman in prosecuting their motion to withdraw as counsel for McFarland in the Gregory suit, because of possible conflict of interest between their two clients, McFarland and Johnson, was reversed. The amount there involved was $1,562.50.

3. Plaintiff Knapp's cross-appeal from the District Court's denial of her claim for $775 for services rendered by Friedman as "special prosecutor" in the Fodiman criminal contempt proceeding was affirmed.

4. The Appellate Court affirmed the judgment for the time charges and for the bonus agreement, except that the court directed that one issue, i.e., the fairness and reasonableness of the contract to pay that bonus, be remanded for further proceedings.

5. In connection with the hearing on the issue of the remand, the Court of Appeals specified as follows:

"In view of the extensive evidence already received that is relevant to the issue, we believe that McFarland should be limited upon the hearing to cross-examination of Tanner and Friedman and to the introduction of such expert witnesses as he may wish to offer. In remanding this aspect of the case for a further hearing and findings, we do not wish to imply that the court's finding of reasonableness was not supported by substantial evidence in the record as it now stands or that the additional proof (which

we, of course, have not seen) will necessarily change the result. We simply believe that McFarland should have the opportunity to offer the foregoing additional proof and to argue that it calls for a contrary decision on the issue. We are confident that the additional eidence will, together with that already introduced, be fairly considered by Judge Levet in making findings on the issue."

In accordance with the remand directed, this court held a further hearing on May 3, 1972 to afford McFarland the opportunity to cross-examine Tanner and Friedman as to the reasonableness issue, directly examine any expert witnesses, and/or adduce additional proof with respect thereto. However, although McFarland cross-examined Tanner and Friedman at the hearing, he did not introduce any expert opinion on the question of fees, although his pretrial memorandum of April, 1972, filed in response to the court's direction therefor, named a witness who would be called. Nor did McFarland make any tender of proof to the court of what such expert would testify to, had he been called. (Tr.[1] 1594 et seq.; McFarland's Memorandum entitled "General Nature of Proposed Proof," p. 3.)[2]

After hearing the testimony of the parties, examining the exhibits, the pleadings, the proposed findings of fact and conclusions of law and certain memoranda of law submitted by counsel, this court makes the following findings of facts and conclusions of law:

### FINDINGS OF FACT

1. I here repeat all my findings of fact made in my opinion dated July 1, 1971.

2. By the time of retaining the firm of Tanner & Friedman (in December, 1963) and at all times subsequent, McFarland was an experienced real estate investor and developer, endowed with considerable business acumen, savvy and experience. In this capacity he had dealt with properties worth many millions of dollars. (Tr. 127–128, 132, 539, 540, 658, 910, 1046, 1307; Ex. 1,[3] Ex. 24, Ex. 58, Ex. 78, ¶¶ 1–8; Ex. 1 (5/3)[4], Rosenberg affidavit: ¶¶ 21, 31, 42, 144; Ex. 2 (5/3) McFarland affidavit, sworn to April 13, 1965: ¶ 16.)

3. At the time of McFarland's retention of Tanner & Friedman (in December, 1963), McFarland had been a client of a number of different law firms and a party to several substantial and complex litigations. Over a great many years, and prior to the retention of Tanner & Friedman, McFarland had had considerable experience in relating to, as well as dealing with, attorneys. (Tr. 127–128, 132, 134, 226–241, 381–382, 510, 539–540, 1046, 1307, 1577, 1585; Ex. 1, Ex. 19, Ex. 20, Ex. 24, Ex. 27, p. 1 of "Outline of History [etc.]," Ex. 34, Ex. 78, ¶¶ 9–10.)

4. From the time of their graduation from the Harvard Law School in 1949, Tanner and Friedman have been in the practice of law in New York City.

With respect to Mr. Friedman, between 1951 and 1963 he was first an associate and later a partner of the firm of Gallop, Climenko and Gould in New York City. At that firm, and later at the firm of Tanner & Friedman, Mr. Friedman specialized in and was responsible for difficult litigation matters in a variety of areas.

Mr. Tanner, too, was an associate and later a member of the firm of Gallop,

---

1. "Tr. ——" references are to pages in the trial transcript subsequent to the swearing of the first witness.

2. McFarland characterized the Court of Appeals affording him the opportunity to put on expert witnesses as "gratuitous"—something for which he did not ask. (Tr. 1598.)

3. "Ex. ——" references are to exhibits in evidence at the trial of this action (March 31 through April 8, 1971).

4. "Ex. —— 5/3" references are to exhibits in evidence at the hearing on remand conducted on May 3, 1972.

Climenko and Gould between the years 1949 and 1963. At Gallop, and thereafter at the firm of Tanner & Friedman, Tanner specialized in and was responsible for substantial corporate, real estate, tax and securities matters. When McFarland had been a client of Gallop, Climenko and Gould in the periods 1953 to 1957 and 1961 to 1963, Tanner worked on the legal problems relating to the initial financing and construction of Arlington Towers and later on proceedings before the District Court which led to the 1962 Supplementary Judgment. As an attorney at Gallop, Tanner became familiar with the background as well as the difficulties involved in the Arlington Towers project. (Tr. 1–9, 391–395, 584–586, 768, 964, 1430–1431, 1518–1523, 1588–1590; Ex. C (5/3), Tanner Affidavit: ¶¶ 2–4; Ex. 2 (5/3), Rifkind Affidavit, sworn to April 1, 1965.)

5. McFarland and Johnson retained Edward Bennett Williams, Esq., to succeed Gallop, Climenko and Gould, Esqs., as their counsel. Nevertheless, McFarland initiated meetings with Tanner to request his specific advice because of Tanner's expertise in areas of financing, real estate and tax law and his prior acquaintance with the Arlington Towers matter. (Tr. 9, 13, 15, 22–23, 391–395, 584–586, 964, 1518–1523, 1588–1590; Ex. C (5/3), Tanner Affidavit: ¶¶ 2–4; Ex. 2 (5/3), Rifkind Affidavit sworn to April 1, 1965.)

6. In December, 1963 (and at times subsequent thereto) McFarland stated to Tanner that the paragraph 9 leaseholds were worth $24 million to $25 million, which was from $4 million to $5 million in excess of the then paragraph 9 formula price. McFarland told Tanner that if reacquisition could be accomplished, it would result in a substantial monetary benefit to Johnson and himself.

At all relevant times during the performance of services by Tanner & Friedman, McFarland and Johnson wanted to exercise the paragraph 9 rights. McFarland devoted eleven years of litigation, including several appeals, to accomplish that objective. (Tr. 22–23, 39, 61–62, 236, 273–274, 520, 592, 1470.)

7. The tasks accomplished by Tanner & Friedman in their representation of McFarland and Johnson in the *Gregory* action were extremely intricate and extensive, required the solution of many complex legal problems of substantive law and procedure, which demanded expert knowledge and judgment. These matters involved property rights of substantial character. (Findings of Fact Nos. 4, 7 and 8, Opinion of this Court, dated July 1, 1971.)

8. At all times relevant, McFarland and Johnson knew the nature of the issues involved in their attempts to reacquire the Arlington Towers leaseholds. McFarland repeatedly consulted with Tanner and Friedman and advised them in conducting the various legal steps involved. At all relevant times, McFarland was informed about the procedures adopted and the results of Tanner & Friedman's efforts. (Tr. 22–23, 226–227, 229–230, 1450–1452, 1556; see also Ex. 34 summaries.)

9. One of the most difficult and important services provided by the firm of Tanner & Friedman was their review, analysis, strategy and eventual success in overcoming the obstacles created by the DeWind tax opinion in order for McFarland to reacquire the leaseholds. This opinion had been prepared in January 1963 by Adrian DeWind, Esq., a member of the law firm of Paul, Weiss, Rifkind, Wharton and Garrison, attorneys for the Gregory defendants.

At the same time that McFarland conferred with Tanner and Friedman in this matter, he consulted the firm of Edward Bennett Williams, which reported that the DeWind opinion was an "overriding" obstacle to McFarland's desire to exercise the paragraph 9 rights. The Edward Bennett Williams firm prognosticated "slim" possibilities of circumventing the DeWind opinion. (Tr. 22, 37, 224, 226–227, 507, 1404, 1412; Ex. C (5/3), McFarland Affidavit: ¶¶ 26–32; Ex. 4 (5/3).)

10. In the spring of 1964 the Gregory defendants repeatedly interposed legal impediments in order to block the reacquisition of Arlington Towers, all of which were ultimately overcome by Tanner & Friedman. (Tr. 229–230, 1419–1420, 1430, 1452–1454, 1458, 1463–1464, 1556; Ex. 34, pp. 9–14.)

11. After the realization that McFarland (and Johnson) could reacquire Arlington Towers only after conducting extensive litigation, and with the further acknowledgment that success therein involved overcoming various complex legal obstructions, McFarland proposed to Tanner & Friedman the 1964 fee arrangement. That agreement (admitted to be fair and reasonable, see Finding of Fact No. 6, opinion dated July 1, 1971) provided for reduced time charges ($30 per hour for partners' time and $15 per hour for associates' time) with the proviso for an "upward adjustment of fees" based upon a "good result.") (Tr. 56–57, 61–65, 69–70.)

12. By July 30, 1965 McFarland had arranged for $19 million in mortgage financing to exercise the paragraph 9 rights, pursuant to a then-pending settlement plan. At the last minute, the Gregory defendants rejected the settlement terms creating additional legal and monetary obstacles to McFarland's reacquisition. (Tr. 239.)

13. Thereafter, Tanner & Friedman relentlessly attempted to stabilize McFarland's position, under a great time constraint, by preparing an application containing numerous affidavits and exhibits (the "March 1, 1965 application") and a tender accompanied by an order to show cause, thus supporting McFarland's attempts to exercise the paragraph 9 rights.

In addition, and at the same crucial time, Tanner was instrumental in obtaining the required additional financing for McFarland's tender. McFarland would only accomplish the reacquisition by the use of loans, secured by the leaseholds. Tanner arranged an appointment with a personal acquaintance, who was employed as an officer in a finance company, thereby obtaining an additional $1 million in financing. By reason of Tanner & Friedman's efforts, McFarland and Johnson were able to reacquire the property without the necessity of advancing their own funds. (Tr. 239–240, 1031, 1484, 1511.)

14. In early 1967, McFarland described the March 1, 1965 application as one which was "superbly prepared," an "excellent preparation," despite the fact that he was engaged in disputes with Tanner & Friedman. (Ex. 27, ¶ 9 of "Outline of History [etc.].")

15. To counteract the March 1, 1965 application, the *Gregory* defendants attempted to sell or refinance the Arlington properties, thus destroying McFarland's rights. In response thereto Tanner & Friedman were successful in obtaining, in effect, an injunction from Judge Dimock precluding the *Gregory* defendants from an immediate disposal of the property. (Tr. 233–234; Ex. 34, p. 15; Ex. 2 (5/3), Order dated March 18, 1965; Ex. 3 (5/3), p. 6 of transcript of March 18, 1965.)

16. As a result of the diligent and resourceful efforts of Tanner & Friedman, the *Gregory* defendants were ultimately compelled to capitulate and accept McFarland's (and Johnson's) tender. (Tr. 1541–1542, 1547–1548; Ex. 12, p. 4; Ex. 18, Ex. 21.) McFarland thus attained the goal for which he retained Tanner & Friedman—reacquisition—as well as the reservation of his other rights and claims against the *Gregory* defendants. (Tr. 673, 1540; Ex. 18, Ex. 21, Ex. 34, p. 17.)

17. The Equitable Life Assurance Society of the United States, in connection with and as a foundation for its mortgage for the benefit of McFarland (and Johnson), appraised the leasehold property of Arlington Towers on July 8, 1965 at $24 million. (Tr. 1514; Ex. 5 (5/3), pp. 3, 34.) Upon reacquisition of the leaseholds, McFarland insured the title to the property for $25 million. (Ex. 65.) Moreover, McFarland had always taken the position that the paragraph 9

rights had a value in excess of $24 million. (Tr. 22, 27, 32, 62, 1128–1129, 1155, 1395, 1531, 1551; see also this court's opinion dated July 1, 1971, p. 613 and the opinion of the Court of Appeals dated March 28, 1972, 2 Cir., 457 F.2d 881.)

18. At various times pertinent herein, McFarland (and Johnson) acknowledged that Tanner and Friedman were entitled to a $155,000 bonus. At no time did either of these men indicate that the fee agreement was unfair, overreaching or unconscionable. (See Findings of Fact Nos. 12 and 13, Opinion of this court dated July 1, 1971; see also Supplemental Finding of Fact 6A, Memorandum of this court dated July 9, 1971.) [5] The contract of McFarland (and Johnson) in substance to pay a bonus of $155,000 was fair and reasonable under all of the circumstances.

## DISCUSSION

█ It is elementary that an important factor in determining the value of the services of an attorney is the measure of success with which they are crowned. Application of Harris, 277 App.Div. 1030, 100 N.Y.S.2d 784; Koerner v. Associated Linen Laundry Suppliers, Inc., 270 App.Div. 986, 62 N.Y.S.2d 774.

In In the Matter of Potts, 213 App. Div. 59, 62, 209 N.Y.S. 655, 656 (4th Dept. 1925), Hubbs, P. J., wrote:

"In general, the court, in determining the justice and reasonableness of an attorney's claim for services, should consider the time spent, the difficulties involved in the matters in which the services were rendered, the nature of the services, the amount involved, the professional standing of the counsel, and the results obtained. (Matter of Lester, supra, [172 App. Div. 509], at page 520, (158 N.Y.S. 763); Schlesinger v. Dunne et al, 36 Misc.Rep. 529, 73 N.Y.S. 1014; Matter of Sewell, 32 Misc.Rep. 604, 67 N.

Y.S. 456; Randall v. Packard, 142 N. Y. 47, 36 N.E. 823; 5 Corpus Juris, 750.

"The value of an attorney's services cannot be limited to 'specified and detailed bills of particulars with a specified amount for each item, as in the case of goods sold, or mere manual services rendered.' Matter of Sewell, supra, 32 Misc. 607, (67 N.Y.S. 456).

"That is necessarily so, for the real value of an attorney's services may be the result of his thought about the legal questions involved, while away from his office, at home, or elsewhere. An idea thought out in bed at night may be the most valuable part of an attorney's services, and may constitute a solution of the vital question involved in a litigation."

I have concluded that it is improper in determining the reasonableness of the contract set forth in Findings of Fact Nos. 6 and 9 of July 1, 1971 to consider events subsequent to the reconveyance of the leaseholds in August 1965. It would be equally unfair, for example, if inflation in real estate values took place between 1965 and 1970 to allow Tanner & Friedman to claim a consideration of such enhanced benefits. In this connection see 7 C.J.S. Attorney and Client § 204, where it is stated: "Evidence is not admissible, however, as to the prospective benefits which may accrue in the future." See note 3.

The contract entered into by defendant with Tanner & Friedman was, in part, a contingent agreement dependent upon achieving a good result either by way of litigation or judgment. (Finding of Fact No. 6, p. 12, July 1, 1971.) The amount of $155,000 was later agreed to by McFarland. (Findings of Fact Nos. 12, 13, 14, 15.)

In 3 New York Jurisprudence, § 98, pp. 500–501, the author states:

"The amount of a contingent fee is not a circumstance to be considered

5. It is also noteworthy that Johnson, McFarland's associate in interest in the Gregory action has paid his one-half share of the Tanner & Friedman retainer bill, in full, without any protest whatsoever.

apart from the other circumstances of the retainer in determining whether the contract is unconscionable. The word 'unconscionable,' when applied to contracts for what are deemed exorbitant contingent fees, means nothing more than that the amount of the fee standing alone and unexplained may be sufficient under the circumstances to show that an unfair advantage was taken of the client, or, in other words, that a legal fraud was perpetrated upon him. The question is one of fact, depending upon the character of the claim, the amount of services to be rendered in prosecuting it to judgment, and the professional standing of the attorney and his ability or special fitness for the work contemplated by the contract. If contingent compensation is larger than absolute compensation, it is properly so, for, when entered into, the extent of the services required cannot be forecast, and moreover the professional services rendered are at the attorney's peril." [Footnotes omitted.]

 McFarland acted freely and fully understood the bonus contract and its purport, had a knowledge of all material circumstances known to Tanner and Friedman, who were not guilty of fraud in any respect and who made no improper use of the confidence imposed in them. Compare Blaikie v. Post, 137 App.Div. 648, 122 N.Y.S. 292 (1st Dept. 1910). The contract in substance to pay a bonus of $155,000 was completely fair and reasonable.

### CONCLUSION OF LAW

1. The retainer agreement as set forth in Findings of Fact Nos. 6 and 9, opinion of July 1, 1971, was fair, reasonable, conscionable and was entered into by McFarland without pressure or fraud, undue influence of any kind, or through any improper use of the confidence imposed in them.

Settle amended judgment pursuant hereto and pursuant to the deduction of $1,562.50 directed by the Court of Appeals on notice within five days.